**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 12-1195**

———————————

MARY T. LACLAIR, Individually and as Personal
Representative of the Estate of Cameron J. LaClair, Jr.,

Plaintiff – Appellant,

v.

SUBURBAN HOSPITAL, INCORPORATED,

Defendant – Appellee,

and

PHYSICAL THERAPY AND SPORTS MEDICINE BINH M. TRAN, P.T., INC.;
CATHERINE L. COELHO, M.P.T., f/k/a Catherine Chamberlain;
SUBURBAN HOSPITAL FOUNDATION, INC.; SUBURBAN HOSPITAL HEALTHCARE
SYSTEM, INC.,

Defendants.

———————————

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.   Peter J. Messitte, Senior District
Judge.  (8:10-cv-00896-PJM)

———————————

ARGUED:  January 31, 2013          Decided:  April 15, 2013

———————————

Before TRAXLER, Chief Judge, and KEENAN, and THACKER, Circuit
Judges.

———————————

Affirmed by unpublished per curiam opinion.

———————————

**ARGUED:** Patrick Michael Regan, REGAN ZAMBRI LONG & BERTRAM, Washington, D.C., for Appellant.   Michael E. von Diezelski, ADELMAN, SHEFF & SMITH, LLC, Annapolis, Maryland, for Appellee. **ON BRIEF:** Jacqueline T. Colclough, REGAN ZAMBRI LONG & BERTRAM, Washington, D.C., for Appellant.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Mary T. LaClair, individually and as personal representative of the estate of her husband, Cameron J. LaClair, Jr., appeals the district court's order finding that the Appellee, Suburban Hospital, Inc. ("Suburban"), and Physical Therapy and Sports Medicine ("PTSM"), were joint tortfeasors with respect to her husband's injuries sustained while he was a patient at Suburban. Mr. LaClair was first injured while receiving physical therapy at PTSM. After undergoing surgery at Suburban for that injury, he was further injured by the actions of Suburban's patient care technicians. Suburban asks us to affirm the district court's conclusion that it is a joint tortfeasor with PTSM because its actions did not constitute a superseding cause of harm to Mr. LaClair.

In unraveling this appeal, Maryland law directs us to several provisions of the Restatement (Second) of Torts, each of which is grounded in the idea that an intervening act is not a superseding cause if it was foreseeable at the time of the primary negligence. Because the harm and injuries sustained at Suburban were foreseeable consequences of the alleged negligence of PTSM, Suburban's actions were not a superseding cause of Mr. LaClair's injuries. Thus, Suburban and PTSM are joint tortfeasors, and we affirm.

I.

A.

On November 1, 2007, Mr. LaClair, a "vibrant former CIA officer" in his mid-80s, J.A. 211,[1] sustained an injury while receiving physical therapy at the PTSM facility (the "November 1 incident").  He was attempting to secure himself in a piece of exercise equipment and fell onto the floor, while his physical therapist had stepped away.  He was taken by ambulance to Suburban, where he was diagnosed with a cervical fracture and dislocation.

Dr. Alexandros Powers, a neurosurgeon, performed surgery on Mr. LaClair on November 3, 2007.  The surgery entailed Dr. Powers inserting screws and rods to secure Mr. LaClair's spine.  According to Dr. Powers, the surgery "was successful and proceeded without complication, and Mr. LaClair's prognosis at that time included a complete and total recovery free from future cervical spine surgery."  J.A. 227.

Dr. Powers stated that, as of the morning of November 6, 2007, Mr. LaClair was "recovered and was to be discharged [from Suburban] to a rehabilitation facility" the next day, and "there was no plan or expectation for subsequent cervical spine

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

4

surgeries due to the success of the November 3 surgery[.]" J.A. 228. Later on November 6, Mr. LaClair was transferred from ICU to a regular room, and his catheter was removed. He needed assistance using the bathroom, and, after Mrs. LaClair called several times for assistance, two patient care technicians responded. Mr. LaClair used the bathroom, and the patient care technicians attempted to reposition him in his hospital bed.

Although Suburban claims Mrs. LaClair "resort[s] to hyperbole when referring to the conduct of November 6," and the patient care technicians, while perhaps negligent, were "performing their normal duties when they were aiding Mr. LaClair and repositioning him in bed," Br. of Appellee 6, Mrs. LaClair views the incident as out of bounds because her husband's "head was violently pushed against the side rail of the bed and he cried out in pain," Br. of Appellant 4. Mrs. LaClair testified that one of the patient care technicians was "very rough," explaining, "her motions were gross motions. They weren't careful motions. And I thought, with somebody with a broken neck, I think I'd be careful, but there was none of that." J.A. 362-63 (the "November 6 incident").

There is no dispute that Mr. LaClair sustained additional injuries as a result of the November 6 incident. Dr. Powers examined Mr. LaClair and found "a fracture of the C7 endplate, dislocation at C6/C7, dislodging of the screws placed

in previous surgery, ligament damage and hemorrhage, nerve root injury at the level of C7 and C8 and spinal cord injury." J.A. 228. He determined Mr. LaClair could no longer be discharged on November 7 as previously scheduled, but rather, needed to undergo an additional surgery on November 8. Mr. LaClair later underwent a third surgery on February 6, 2008, at Georgetown University Hospital. He spent nearly five months hospitalized, underwent plaster casting of his cervical spine, developed bedsores, and ultimately required a feeding tube.

Mrs. LaClair presented evidence to the district court that as a result of the November 6 incident, Mr. LaClair's medical bills totaled over $1.05 million and had a projected future cost of $900,000. Another physician testified that absent the November 6 incident, his medical and rehabilitation expenses would have been only $75,000 to $125,000.

B.

The LaClairs filed two separate lawsuits: first, against PTSM for injuries stemming from the November 1 incident (filed March 19, 2009) (the "PTSM lawsuit"), and second, against Suburban for "separate and distinct" injuries stemming from the

November 6 incident (filed April 15, 2010) (the "Suburban lawsuit").[2]

The PTSM lawsuit alleged that PTSM was responsible for not only the injuries and damages incurred from the November 1 incident at PTSM's facility, but also the injuries and damages incurred from the November 6 incident at Suburban. See J.A. 48 (PTSM Complaint) ("Plaintiff was taken via ambulance to Suburban [] where he was diagnosed with a cervical fracture and dislocation. Plaintiff remained at Suburban until November 13, 2007, where he underwent two surgical procedures to repair his cervical fracture, among other things."). During discovery, however, Dr. Powers testified on January 5, 2010, that the injuries stemming from the November 1 incident were "separate, distinct, and divisible" from those sustained by the November 6 incident. Id. at 229, 262-329.

Subsequently, the LaClairs settled with PTSM for $1 million on March 5, 2010. The Settlement Agreement specifically recognized that the LaClairs would be pursuing separate claims against Suburban, in connection with the November 6 incident alone:

---

[2] Mr. LaClair passed away on November 4, 2011, during the course of this litigation. Mrs. LaClair took over as personal representative of his estate and was substituted as Plaintiff on January 25, 2012.

> In any future action against [Suburban], the plaintiffs agree to file a pre-trial motion with the court attempting to establish that the conduct of Suburban . . . constituted superintervening negligence, and that these defendants are not joint tortfeasors with Suburban[.] The purpose of this requirement is to obviate the need for [PTSM] to be named as [a] part[y] in any future litigation.

J.A. 179.

The Suburban lawsuit, filed about six weeks after the PTSM settlement, alleges that Mr. LaClair suffered injuries from the November 6 incident that were separate and distinct from those of the November 1 incident. This litigation settled on May 31, 2011. Pursuant to the Settlement Agreement between the LaClairs and Suburban, however, the parties agreed to submit to the district court the question of whether PTSM and Suburban were joint tortfeasors in connection with the November 6 incident, or whether those injuries were separate and distinct such that Suburban alone would be liable. Pursuant to the Settlement Agreement, Suburban agreed to make an initial $650,000 payment to the LaClairs and further agreed to make an additional payment of $600,000 in the event that the court found PTSM and Suburban were not joint tortfeasors as to the November 6 incident.

### C.

In accord with the PTSM Settlement Agreement, the LaClairs filed a pre-trial motion in the Suburban lawsuit on

June 10, 2011, asking for judicial determination that Suburban was a "successive tortfeasor" and therefore, not entitled to joint tortfeasor credit for the November 6 incident.  J.A. 140.[3] That same day, Suburban filed a memorandum explaining why it should bear joint tortfeasor status with PTSM.

The district court held a motions hearing on January 20, 2012, and decided that Suburban was indeed a joint tortfeasor with PTSM such that Mrs. LaClair could not recover additional damages.  The district court explained,

> [T]his was not highly extraordinary.  That this kind of thing could well have happened, even if the doctors did not see it or had seen it themselves.  But a reasonable man knowing what they knew at the time would conclude that this sort of thing might happen. . . .  I am persuaded by the fact that if what happens is reasonably close to the reason for the initial hospitalization, which is what this was, then you really do have a kind of a continuous flow here, and whatever negligence you have is really part and parcel of the initial negligence, too.
>
> And so I do conclude on these facts that the liability of the – the defendant, Suburban Hospital, is joined and not independent.

J.A. 771.  The court entered a short, one-page order to this effect on January 24, 2012, naming Suburban as a joint tortfeasor "for reasons stated in the record."  <u>Id.</u> at 797.  It is from that order that Mrs. LaClair appeals.

---

[3] Solely for purposes of the motion on the causation issue, Suburban conceded that it was negligent on November 6, 2007, but it continued to dispute all issues of causation and damages.

II.

The parties submit that the district court's order is reviewed for clear error. However, this analysis necessarily involves deciding whether the district court correctly applied Maryland law, and thus, we approach this appeal "by inspecting factual findings for clear error and examining de novo the legal conclusions derived from those facts." F.C. Wheat Mar. Corp. v. United States, 663 F.3d 714, 723 (4th Cir. 2011). A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985) (internal quotation marks omitted).

Because this case is in federal court based on diversity jurisdiction, the substantive law of the forum state — in this case, Maryland — applies. See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938). We should determine:

> how the [Court of Appeals of Maryland] would rule. If th[at] [court] has spoken neither directly nor indirectly on the particular issue before us, we are called upon to predict how that court would rule if presented with the issue. In making that prediction, we may consider lower court opinions in [Maryland], the teachings of treatises, and the practices in other states.

Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433
F.3d 365, 369 (4th Cir. 2005) (internal quotation marks and
citations omitted).

### III.

#### A.

PTSM will not be jointly liable for the November 6
incident "if it appears highly extraordinary and unforeseeable
that the plaintiffs' injuries [on November 6] occurred as a
result of [PTSM's] alleged tortious conduct." Pittway Corp. v.
Collins, 973 A.2d 771, 788 (Md. 2009). Accordingly, PTSM avoids
liability for the November 6 incident "only if the intervening
negligent act," i.e., Suburban's conduct, "is considered a
superseding cause of the harm to" Mr. LaClair. Id. at 789; see
also Morgan v. Cohen, 523 A.2d 1003, 1004-05 (Md. 1987) ("It is
a general rule that a negligent actor is liable not only for
harm that he directly causes but also for any additional harm
resulting from normal efforts of third persons in rendering aid,
irrespective of whether such acts are done in a proper or a
negligent manner.").

Maryland courts (and federal district courts sitting
in diversity) have addressed the superseding cause issue with
varying results. Pittway is the seminal Maryland case on
superseding cause, providing a framework for analyzing an
argument that an intervening act cuts off the liability of an

11

original  tortfeasor.    The  Court  of  Appeals  of  Maryland

explained:

> The defendant is liable where the intervening causes,
> acts, or conditions were set in motion by his earlier
> negligence, or naturally induced by such wrongful act
> . . . or even it is generally held, if the intervening
> acts or conditions were of a nature, the happening of
> which was reasonably to have been anticipated[.]

Pittway, 973 A.2d at 789 (internal quotation marks and

alteration omitted). Pittway recognizes that Section 442 of the

Restatement (Second) of Torts establishes the test applied in

Maryland courts for analyzing superseding cause:

> The following considerations are of importance in
> determining whether an intervening force is a
> superseding cause of harm to another:
>
> (a) the fact that its intervention brings
> about harm different in kind from that which
> would otherwise have resulted from the
> actor's negligence;
>
> (b) the fact that its operation or the
> consequences thereof appear after the event
> to be extraordinary rather than normal in
> view of the circumstances existing at the
> time of its operation;
>
> (c) the fact that the intervening force is
> operating independently of any situation
> created by the actor's negligence, or, on
> the other hand, is or is not a normal result
> of such a situation;
>
> (d) the fact that the operation of the
> intervening force is due to a third person's
> act or his failure to act;
>
> (e) the fact that the intervening force is
> due to an act of a third person which is
> wrongful toward the other and as such

subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

Restatement (Second) of Torts § 442 (1965); <u>Pittway</u>, 973 A.2d at 789.

### B.

We conclude that the district court did not err in finding that Suburban and PTSM were joint tortfeasors.

### 1.

The majority of the Restatement Section 442 factors weigh in favor of a conclusion that Suburban and PTSM were joint tortfeasors.

### a.

As to factor (a), above, Mrs. LaClair attempts to show that the injuries sustained on November 6 were "separate and distinct" from those sustained on November 1, and thus, "different in kind." <u>See</u> Br. of Appellant 3-9. We first note that we would be hard-pressed to find a case regarding subsequent negligent medical care in which there was <u>not</u> a "separate and distinct" injury after the injury caused by the initial actor's negligence. This, alone, does not lead us to the conclusion that the negligent medical care is a superseding cause of harm. <u>See</u> <u>Underwood-Gary v. Mathews</u>, 785 A.2d 708, 713

13

(Md. 2001) ("[W]hen a physician negligently treats the plaintiff's injuries, the physician becomes liable to the plaintiff to the extent of the harm caused by the physician's negligence. Thus, the physician's negligent treatment is a subsequent tort for which both the doctor and the original tortfeasor are jointly liable." (internal citations omitted)). In any event, the harm brought about by the November 6 incident was not so different from the type of harm that is likely to result from an 86-year-old man's fall from a piece of exercise equipment, even assuming, as Mrs. LaClair would have us do, that a severe spinal cord injury resulted from Mr. LaClair's repositioning in his bed. For these reasons, factor (a) weighs in favor of Suburban.

b.

In addressing factor (b), the Restatement directs us to look to Restatement (Second) of Torts § 435(2), Comments (c) and (d). Comment (c) provides, in part, "Where it appears to the court in retrospect that it is highly extraordinary that an intervening cause has come into operation, the court may declare such a force to be a superseding cause." Restatement (Second) of Torts § 435(2) cmt. c (1965). Comment (d) provides, in part, "The court's judgment as to whether the harm is a highly extraordinary result is made after the event with the full knowledge of all that has happened. This includes those

14

surroundings of which at the time the actor knew nothing but which the course of events discloses to the court." Id. cmt. d. Comment (d) continues:

> [The court] also follows the effects of the actor's negligence as it passes from phase to phase until it results in harm to the plaintiff. In advance, the actor may not have any reason to expect that any outside force would subsequently operate and change the whole course of events from that which it would have taken but for its intervention. None the less, the court, knowing that such a force has intervened, may see nothing extraordinary either in its intervention or in the effect which it has upon the further development of the injurious results of the defendant's conduct. This is particularly important where the intervening force is supplied by the act of a human being . . . , which is itself a reaction to the stimulus of a situation for which the actor is responsible.

Id.

Mrs. LaClair presents testimony from three neurosurgeons that the "application of [the patient care technicians'] force to the body of an elderly, post-operative cervical spine patient . . . had never before been witnessed or known to them in all their years of practice as Neurosurgeons[.]" Br. of Appellant 27 (citing J.A. 190, 222, 229). However, as explained by Comment (d) above, PTSM may have had no reason to expect that Mr. LaClair would be injured by being repositioned in his hospital bed, but the proper way to view the situation is after-the-fact: "knowing that such a

force _has_ intervened." Restatement (Second) Torts § 435 cmt. d (emphasis added).

For example, in <u>Henley v. Prince George's Cnty.</u>, the Court of Appeals of Maryland explained the difference between foreseeability when considering the existence of a duty and, as here, causation: "Foreseeability as a factor in the determination of the existence of a duty involves a <u>prospective</u> consideration of the facts existing at the time of the negligent conduct. Foreseeability as an element of proximate cause permits a <u>retrospective</u> consideration of the total facts of the occurrence[.]" 503 A.2d 1333, 1341 (Md. 1986) (emphases added). Viewing the facts of this case retrospectively, there is "an appropriate nexus" between the November 1 incident and injuries and the November 6 incident and injuries such that it is "at least a permissible conclusion" that Mr. LaClair's already-injured spine would be further injured by being positioned into a hospital bed. <u>Id.</u> at 1342.

Again, we agree with the district court that Suburban's actions were not "so extraordinary as to bring about a conclusion of separate intervening cause." J.A. 766. Thus, factor (b) also weighs in favor of Suburban.

16

c.

Considering the cross-referencing set forth in Restatement (Second) Section 442, factors (c), (e), and (f)[4] boil down to the same core inquiries: whether Suburban's actions were "a normal consequence of a situation created by the actor's negligent conduct,"[5] and whether the manner in which the intervening act was done was "extraordinarily negligent." Restatement (Second) Torts §§ 443, 447(c) (1965).

First, clearly, Mr. LaClair would not have sustained the injuries on November 6 if PTSM's negligence had not put him in the hospital in the first place.[6] And the district court

---

[4] As to factor (d), the district court dismissed this factor as irrelevant to the inquiry, but it only appeared to analyze the "failure to act" portion of § 442(d). See J.A. 767-68. While this may have been legal error, even assuming factor (d) weighs in favor of Mrs. LaClair, the balance of the factors nonetheless weighs in favor of Suburban.

[5] The comments to factor (c) explain that the "situation created by the actor's negligence" means any situation that the original tortfeasor's actions were a substantial factor in bringing about. See Restatement (Second) of Torts §§ 447(c), 442(c) cmt. d.

[6] Indeed, the LaClairs themselves believed the November 6 incident to be a foreseeable consequence of the November 1 incident. They recognized as much in their initial complaint against PTSM, which sought to hold PTSM liable for "two surgical procedures" at Suburban. J.A. 48 (emphasis added). In addition, on July 12, 2009, the LaClairs answered interrogatories and listed the following as caused by the PTSM's negligence: admission to Suburban from November 1 to November 13, 2007; admission to the rehabilitation center from November 13 to November 30; admission to Georgetown University for (Continued)

17

found, "the act, . . . the putting back in bed is not itself extraordinary." J.A. 767. Mrs. LaClair's attorney agreed. See id. at 709 (The Court: "[T]he objective anyway was to put this man back in bed. That's not unforeseeable; correct? Mr. Regan: Yes."). The district court did not err in finding that it is a "normal consequence," (i.e., foreseeable) that a cervical spine patient might sustain additional spinal injuries at the hands of medical professionals.

As to the manner in which the negligent act was done, we should consider the injuries and the degree of culpability of the patient care technicians. Even if the patient care technicians were "very rough," J.A. 362, that does not quite get us to the level of "extraordinarily negligent." Restatement (Second) of Torts § 447(c). Indeed, Maryland courts have held that original tortfeasors are liable for more significant harm inflicted by intervening negligent medical professionals. See Underwood-Gary, 785 A.2d at 713 ("[An] original tortfeasor is liable for additional harm caused by a treating physician's improper diagnosis and unnecessary surgery[.] This rule is based on the premise that the negligent actor, by his or her conduct, has placed the plaintiff in a

---

surgery from February 5 to February 25, 2008; and home nursing care from April 2008 to July 2009. See id. at 64-78.

position of danger and should answer for the risks inherent in treatment and rendering aid." (citing Restatement (Second) of Torts § 457 cmt. c, illus. 1)); Richards v. Freeman, 179 F. Supp. 2d 556, 560-61 (D. Md. 2002) (where physicians negligently performed surgeries that left car accident victim with a right arterial tear in her heart, finding physicians and original defendant driver to be "joint" yet "subsequent tortfeasors" under Maryland's Uniform Contribution Among Tort-Feasors Act (UCATA)); see also Morgan, 523 A.2d at 1008 (stating that under the UCATA, an original tortfeasor and a negligent health care provider could be considered concurrent tortfeasors concurring in producing the additional harm).

Kyte v. McMillion, 259 A.2d 532 (Md. 1969), cited by Mrs. LaClair, does not change this result. There, a young woman was involved in a car wreck due to a negligent driver, and she was taken to the hospital and treated for broken bones. Upon admission to the hospital, a physician ordered a blood transfusion, but the nurse used the wrong type of blood. See id. at 533. As a result of this mistake, the plaintiff suffered "bleak prospects of future pregnancies" and was projected to have "difficult gestation from both an emotional and physical point of view." Id. The plaintiff filed suit against the hospital first, ultimately reaching an agreement and signing a release as to damages stemming only from

19

the blood transfusion. <u>See</u> <u>id.</u> at 533-34. Later, when the plaintiff filed suit against the allegedly negligent driver, McMillion, the court held that McMillion was not included in the release and thus, the damages awarded to the plaintiff from the hospital should not be credited to McMillion. <u>Id.</u> at 543.

Notably, the Maryland Court of Special Appeals has limited this case to its facts as "the Court [in <u>Kyte</u>] was careful to point out that the injuries [broken bones and inability to have children] were peculiarly separate and divisible[.]" <u>Sullivan v. Miller</u>, 337 A.2d 185, 191 (Md. Ct. Spec. App. 1975). Even the <u>Kyte</u> court itself declared, "It should be understood . . . that the decision announced herein goes no further than the unusual facts and circumstances of this case." <u>See</u> <u>Kyte</u>, 259 A.2d at 543.[7]

Therefore, we cannot say that the negligence of the patient care technicians, either in manner or consequence, was

---

[7] In this appeal, Suburban also contends that the settlement with PTSM already took into account the damages arising from the November 6 incident, and points to the LaClairs' answers to interrogatories on July 12, 2009, in the PTSM lawsuit. <u>See</u> <u>supra</u>, note 7. However, while this argument may have some merit, we do not rely on it because it appears that the LaClairs shifted gears in the middle of their litigation with PTSM (and after the interrogatory answers were filed) due to the testimony of Dr. Powers. Moreover, reliance on this basis is unnecessary given the weight of other factors in favor of Suburban.

abnormal or extraordinary. Thus, factors (c), (e), and (f) weigh in favor of Suburban.

2.

Examining the Restatement Section 442 factors does not end our inquiry. The Court of Appeals of Maryland further explains that Section 447 of the Restatement (Second) of Torts illuminates these factors:

> "The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if
>
> (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or
>
> (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or
>
> (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent."

Pittway, 973 A.2d at 789 (quoting Restatement (Second) of Torts § 447). Thus, "a superseding cause arises primarily when unusual and extraordinary independent intervening negligent acts occur that could not have been anticipated by the original tortfeasor." Id. (internal quotation marks omitted). Therefore, courts should look to both the foreseeability of the

21

harm suffered by the plaintiff, as well as the foreseeability of the intervening act itself. See id. at 792.

Any doubt that the Restatement Section 442 factors weigh in favor of Suburban is resolved by an analysis of Section 447: PTSM should have realized that an elderly man injured by a fall from its own exercise equipment would have to go to the hospital, would receive medical care, and may possibly experience negligent medical care there. Mr. LaClair's ultimate injuries and the manner in which they occurred were not extraordinary, nor were these unfortunate consequences unforeseeable.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.